# IN THE SUPREME COURT OF IOWA

No. 22–0390

Submitted January 23, 2024—Filed June 7, 2024

STATE OF IOWA,

    Appellee,

vs.

KARI JEAN SCHWARTZ,

    Appellant.

---

On further review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Buchanan County, John J. Bauercamper, Senior Judge.

The defendant seeks further review of a court of appeals decision affirming her conviction for sexual exploitation by a school employee. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

McDonald, J., delivered the opinion of the court, in which Oxley, McDermott, and May, JJ., joined. Christensen, C.J., filed a dissenting opinion, in which Waterman and Mansfield, JJ., joined.

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven and Israel Kodiaga, Assistant Attorneys General, for appellee.

**MᴄDᴏɴᴀʟᴅ, Justice.**

Kari Schwartz was found guilty of sexual exploitation by a school employee by a pattern, practice, or scheme, in violation of Iowa Code section 709.15(3)(*a*), (3)(*b*), (5)(*a*) (2009). In this direct appeal, she raises four challenges to her conviction and sentence: (1) there is insufficient evidence of a pattern, practice, or scheme of conduct to support her conviction; (2) the district court erred in instructing the jury that sexual conduct includes hugging; (3) the district court wrongly excluded evidence of an unfounded school investigation into her conduct; and (4) the district court violated her constitutional rights when it applied a sentencing provision in Iowa Code section 907.3 (2022). The court of appeals affirmed Schwartz's conviction and sentence. We granted Schwartz's application for further review, and, in our discretion, we consider only Schwartz's challenges to the sufficiency of the evidence supporting her conviction and to the jury instructions. *See State v. Miller*, 4 N.W.3d 29, 34 (Iowa 2024) ("On further review, we have the discretion to review any issue raised on appeal." (quoting *State v. Vandermark*, 965 N.W.2d 888, 891 (Iowa 2021))). The court of appeals decision is final with respect to all other issues.

I.

The trial record, when viewed in the light most favorable to the jury's verdict, shows the following. In August 2009, Kari Schwartz was employed as a teacher at Independence High School. Seventeen-year-old A.S. was one of the students enrolled in Schwartz's art class. A.S. thought "at first it seemed like a very normal teacher–student relationship," but over the course of the first month of school Schwartz engaged in a pattern, practice, and scheme of conduct that went beyond a normal teacher–student relationship.

Schwartz began spending more time with A.S both in and outside of school. Schwartz spent more time talking to A.S. and her tablemates during

class. Schwartz started out talking about "artwork and stuff," but then the conversations "would get to a point where they were very personal on her end." She spent more time with A.S. outside of art class. Sometimes A.S. would come to the art room to work on a project. Other times, Schwartz would go and find A.S. in another teacher's room and "start talking to [her]." Schwartz also interacted with A.S. outside of school hours, including coming uninvited to A.S.'s home on one occasion.

In addition to interacting with A.S. outside of art class, Schwartz started building a more personal, intimate relationship with A.S. by sharing personal, intimate stories. Schwartz told A.S. tales of her difficult upbringing. Schwartz gave A.S. a detailed account of her walking in on her ex-boyfriend with another man. These personal stories made A.S. feel "trusted" and "good that that was happening . . . , like [Schwartz] was treating [A.S.] as I was an adult." At the time, A.S. was experiencing struggles of her own, including dealing with her mother's cancer battle. Schwartz encouraged A.S. to lean on her for support.

Schwartz also began to make comments regarding A.S.'s physical appearance. Schwartz called A.S. "beautiful" and told her how "pretty" she was. She made comments about A.S.'s "pipes," or arm muscles, telling her that her "pipes" were "so strong!" Some of these comments were made in social media posts. One post stated, "You are such a pretty girl, absolutely love your senior pictures! have a blast at homecoming!"

Schwartz also began to cross physical boundaries with A.S. According to A.S., Schwartz initiated "constant physical contact of some sort almost every time" they interacted. A.S. testified that Schwartz always wanted to hug or touch her in some way. A.S. described the hugs as "a full-on chest-to-chest type hug," "[l]ike, . . . a bear hug, like full body, full strength, like very intimate and close." A.S. thought the hugs were unusually long. One social media post shows

Schwartz and A.S. in a chest-to-chest hug. The picture of Schwartz and A.S. in a chest-to-chest hug was taken in late September when Schwartz invited herself to A.S.'s family pumpkin farm after Schwartz overheard A.S. invite her classmates to help pick pumpkins that weekend.

Schwartz also began communicating directly with A.S. via text messaging and email in a personal, intimate way, including sending invitations to do things together outside school. While Schwartz was sitting a few feet from A.S. in the pumpkin patch, she texted, "Love ya" to A.S., who did not respond. A.S. testified this was one of the "bigger alarms" that she received. A.S. responded by changing the subject. Schwartz then texted A.S. to ask whether she "wanted to go rollerblading or go to [Schwartz's] house sometime." The next day, Schwartz texted A.S. that she was thinking of her. Eighteen minutes later, she texted that she loved A.S. and she was worth the world.

The next day, Schwartz emailed A.S. during the school day:

> Dear [A.S.],
>
> Sweetie [A.S.], I wish i could fix all your hurts. If only it were so easy as to kiss it and say its all better. Hurt, I would do a lot of things to prevent someone from feeling it, and for you I would do anything. You are one of the few people that [I] know th[at] is a good person through the core in all aspects of your life. . . . You have no idea how proud I am to know you. You are making a difference in peoples lives [A.S.]. You impact me. . . . [N]ow you got me crying. Have you ever just come across someone that once you get in this 3 foot radius they just tug at your heart strings? So I am probably not suppose[d] to love my students, but I do you. I can't fix what you are going through but I am here for you anytime day or night. If you have a bad night call me I can come get you we can do something, or we can just talk, or we can just say nothing at all and I will just be by your side. By the way, you give the best hugs ever, like you mean it. Or maybe its just your pipes being so strong!

A.S. responded later that evening, and Schwartz sent A.S. the following email at 4:17 a.m. the next day:

Sweetest [A.S.],

There is no place i would rather be then here for you. You inspire me as well. My life story…it is a long one. some days I feel like it is a soap opera but it has helped make me who I am today and somehow I got to meet you and it's the people like that in my life, that make everything worth while. It's interesting to me how much we have in common, my high school days looked a lot like yours. Volley ball, tennis, band, rollerblading, working out on the farm, stud[y]ing, not letting others see past the smile. How does that happen? I had a lot of really great friends in high school too but it was always my teachers I could talk to because no one else really understood me or why priorities are what they are. I am not sure [I] should have told you and the other girls what I did about me especially since no one in [I]ndependence, or even in [I]owa really knows a lot about me or my past. But I don't have anything to hide either. if you guys want to know i will share. Chances are you guys will forget the stories but you, (well not really you—cause you already know) but they maybe a little bit more gr[ate]ful for what they have. The book will be long forgotten about before the time gets here I am sure. You, [A.S.], have a heart of gold. I hold your trust very high and I will never intentionally hurt you. I have picked up on you have a lot going on in your heart and [I] am here for you. Plus, sometimes i think i get the better end of the deal cause I get one of your hugs. :) So if I get to[o] attached make sure you say something. You can do anything! I do hope to learn more about you as the days go by. You are wonderful. Hope you are sleeping tight. off to rollerblade, hope I don't get blown away!!! Love ya!

Schwartz signed these emails with her first name instead of "Ms. Schwartz."

A.S. printed these emails and showed them to teacher Rachel Hurley that morning. Hurley told A.S. that she would take them to the principal. A.S. proceeded to go to art class with Schwartz as usual that day, but she was quiet and withdrawn. As class ended, Schwartz asked A.S. why she had been so quiet, but A.S. indicated that she did not want to discuss it.

Schwartz continued to question A.S. about what was bothering her, grabbed A.S. by the arm, and guided her into a stairwell to talk. A.S. sat on a step, thinking Schwartz would sit next to her. Instead, Schwartz sat down on the step behind A.S. and straddled her legs around A.S., taking A.S. into what A.S. described "as kind of a bear hug." According to A.S., Schwartz wrapped one arm

around her face and the other "kind of down towards [A.S.'s] hip," proceeded to move her hand above A.S.'s "clothes to the chest" and then "down to [A.S.'s] pants line," and "went below [A.S.'s] clothing towards [her] pubic area"—"kind of, like, above the clitoris area." Schwartz was interrupted by two students starting to walk up the steps. A.S. was "a crying mess." A.S. felt violated and was "in a state of shock." When Schwartz got up to speak to the students, A.S. walked past her and left the stairwell.

A.S. documented this incident with a poem in a journal entry written in 2010. The relevant portions of the journal were admitted into evidence. The poem vividly describes the encounter in the stairwell:

> The way you wrap around me
>
> Compressing your body to mold mine
>
> Drawing your fingers lower on my abdomen to my jeans, begining to slip away
>
> I can feel myself shake, wishing to leave and vanish
>
> "Its gonna be okay. Its gonna be okay."
>
> Footsteps come near, two sets of feet come up the stairs
>
> You stand up, I fall limp like a ragdoll
>
> Directing the boys that you would be up in a minute,
>
> Every square inch of me, numb and lost . . . .

Schwartz emailed A.S. later that day, writing, "[Q]uiet girl today. I do want to hear what happened last night if you want to share. I am here in person, no kids 4th [period] or written works to[o]. So what do you believe?" A.S. and Schwartz thereafter had no further communication because Hurley reported the emails to the principal, Jennifer Sornson. Sornson initiated an investigation. Although A.S. told Sornson about the emails and texts from Schwartz, she did

not tell anyone at the school about what occurred in the stairwell. During the investigation, Schwartz admitted to sending emails and text messages and admitted to hugging A.S. on more than one occasion. Schwartz left her employment with the school early in the investigation process.

Another student at the high school became upset when Schwartz left the school. She knew A.S. was involved in Schwartz leaving, so she stole A.S.'s cell phone with a plan to wipe it and keep it for herself. When she looked through the phone, she read the text messages Schwartz sent to A.S. and was "shocked" because they were so inappropriate. When she found out A.S. had reported the phone stolen, she returned the phone to A.S.

Years later, in 2018, A.S. emailed the school district where Schwartz was then employed. A.S. wrote, "If you have any . . . suspicion, complaints, or concerns about Kari Schwartz . . . , please do not let these suspicions go by." A.S. expressed her desire "to send this email for a few years," but she "did not have the courage to do so (until now)." A.S. described some of her interactions with Schwartz, including the time Schwartz "took [her] to the stairwell, touched [her] inappropriately, and thankfully two students were walking up the stairwell which caused [Schwartz] to let [her] go." Moreover, A.S. expressed that she had "never brought this situation to court" because she "was too scared to do so," but she had "finally gotten to a point where [she] want[s] [her] story to be heard" after eight years of therapy. She indicated that she was "hoping to finally do what should have been done 9 years ago" and report Schwartz's behavior.

In January 2020, A.S. did report Schwartz to the police. She reported the incident regarding the touching in the school stairwell. When asked why she finally reported the touching, A.S. explained that she had learned Schwartz was now teaching middle school special education in another school district and "felt a little responsible because I never turned it in at that point when I was younger."

She also noted that "when the original investigation through the school occurred in 2009," she had "the understanding that [she] had ten years after [she] turned eighteen to report this; otherwise, it would be beyond time frame of reporting." So she "reported it three months shy of [her] turning twenty-eight." Further, A.S. expressed fear and confusion when the touching initially occurred, stating, "This was another female who did this to me and it really threw me off, and I was embarrassed and afraid. . . . [S]tudents were making comments and I was afraid to say anything."

Following A.S.'s 2020 police report, Schwartz was charged with sexual exploitation by a school employee by a pattern, practice, or scheme of conduct to engage in sexual conduct with A.S. The case proceeded to trial, where the jury heard testimony from various witnesses, including A.S., Sornson, Hurley, and other students and colleagues of Schwartz. Schwartz testified in her own defense, claiming that her emails and texts to A.S. were simply an attempt to "build [A.S.] up and just really let her know that people loved and cared about her and wanted to support her." She acknowledged some of the messages sounded bad but maintained they were taken out of context. Schwartz admitted hugging A.S. occasionally, usually through a side hug, but she denied touching A.S.'s chest or underneath her pants in the stairwell.

The jury found Schwartz guilty as charged, and the district court denied Schwartz's subsequent motion for a new trial and sentenced Schwartz to a five-year term of imprisonment and a special ten-year sentence. Schwartz timely appealed, and we transferred her case to the court of appeals. The court of appeals affirmed Schwartz's conviction and sentence.

## II.

Schwartz challenges the sufficiency of the evidence supporting her convictions. She focuses specifically on whether there was sufficient evidence of

a pattern, practice, or scheme. This court reviews sufficiency-of-evidence claims for the correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). Under this standard of review, this court will not disturb the district court's finding if it is supported by substantial evidence. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "Substantial evidence must do more than raise suspicion or speculation." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005). In determining whether the verdict is supported by substantial evidence, this court views the evidence "in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Jones*, 967 N.W.2d at 339 (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).

Where, as here, the defendant does not object to the relevant jury instruction, the instruction is "the law of the case for purposes of reviewing the sufficiency of the evidence." *State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (quoting *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009)). The marshaling instruction provided that the State was required to prove the following:

> 1. On or about August 21, 2009 through October 5, 2009, the defendant, Kari Jean Schwartz, engaged in sexual conduct with [A.S.].

> 2. The defendant, Kari Jean Schwartz, engaged in this conduct as part of a pattern or practice or scheme of conduct.

> 3. The defendant did so with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schwartz or [A.S.].

> 4. The defendant, Kari Jean Schwartz, was then a school employee.

> 5. [A.S.] was then a student.

The jury was also instructed, without objection, that a " '[p]attern or practice or scheme of conduct' means two or more acts constituting a systematic plan to engage in sexual conduct, as opposed to an isolated or accidental act."

The jury instruction on pattern, practice, or scheme was a correct statement of the law. The leading case is *State v. Wickes*, 910 N.W.2d 554 (Iowa 2018). In that case, a teacher exchanged thousands of messages with a student over a forty-five-day period. *Id.* at 570. The content of many of the messages was inappropriate and sexual. *Id.* The teacher also gave the student "dozens of hugs" and had photographs of them hugging. *Id.* We stated that a pattern, practice, or scheme need not "involve multiple students or take place over a certain period of time." *Id.* at 569. Instead, a pattern, practice, or scheme of conduct is "[a] systemic plan; a connected or orderly arrangement, esp[ecially] of related concepts." *Id.* (alterations in original) (quoting *Scheme, Black's Law Dictionary* (10th ed. 2014)). We concluded that the thousands of messages exchanged between the teacher and student and the dozens of hugs over a forty-five-day period were sufficient to establish a pattern, practice, or scheme of conduct to engage in sexual conduct in violation of the statute. *Id.*

Schwartz contends that her conduct does not rise to the level of that in *Wickes*. We agree that Schwartz's conduct was not as extensive as that in *Wickes*, but that distinction is immaterial. *Wickes* did not set a floor on the minimum duration or minimum number of acts necessary to establish a pattern, practice, or scheme. Instead, *Wickes* held that the pattern, practice, or scheme required evidence of connected, systematic, and orderly conduct done for the purpose of achieving sexual conduct with a student. *See id.* The unchallenged jury instruction in this case correctly stated the law as interpreted in *Wickes*, instructing the jury that a " '[p]attern or practice or scheme of conduct' means *two or more acts* constituting a systematic plan to engage in sexual conduct, as

opposed to an isolated or accidental act." (Emphasis added.) The fact that this case involved fewer messages and fewer hugs over a shorter time than in *Wickes* does not necessarily render the evidence insufficient to support the conviction.

When viewed in the light most favorable to the jury's verdict, there is substantial evidence that Schwartz engaged in two or more acts constituting a systematic plan to engage in sexual conduct. Schwartz spent more time with A.S. in school and outside of school, even showing up uninvited at A.S.'s home. Schwartz tried to gain A.S.'s trust by revealing more personal and intimate information about herself. Schwartz commented on A.S.'s physical appearance, telling her she was beautiful, pretty, strong, and had great "pipes." Schwartz sent multiple messages to A.S. telling her that she loved her and inviting her to do things outside of school. Schwartz asked A.S. whether she would go rollerblading with her or just come over to her house. She said she would be there for A.S. "anytime day or night" and that she would "come get [her so] we can do something, or we can just talk, or we can just say nothing at all and I will be by your side." Schwartz even acknowledged it was wrong, stating, "So I am probably not suppose[d] to love my students, but I do you."

And Schwartz's pattern, practice, and scheme actually resulted in sexual conduct with A.S. Schwartz hugged A.S. in such a way that the jury could infer it was done with the specific intent to satisfy the sexual desires of Schwartz. *See State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998) (stating that since "[s]pecific intent is seldom capable of direct proof"; it will often "be shown by circumstantial evidence and the reasonable inferences drawn from that evidence"). The hugs were full chest-to-chest hugs and not merely side hugs or platonic hugs. Schwartz commented on the hugs in a sexual manner. She told A.S., "[Y]ou give the best hugs ever, like you mean it. Or maybe its just your pipes being so strong." She also told A.S., "[S]ometimes [I] think [I] get the better end of the deal

cause I get one of your hugs. :) So if I get to[o] attached make sure you say something." This is sufficient evidence for the jury to find Schwartz's hugs constituted sexual conduct. *See Wickes,* 910 N.W.2d at 568 (holding there was substantial evidence that hugs constituted sexual conduct when viewed in context). In addition, Schwartz engaged in sexual conduct when she touched A.S. in the stairwell at the school. Schwartz sat down on the stair behind A.S. and straddled her legs around A.S. into "kind of a bear hug" before moving her hand above A.S.'s "clothes to the chest" and then "below [her] clothing towards [her] pubic area. . . . [K]ind of, like, above the clitoris area." The sexual nature of her actions may be inferred from the actions themselves. *See State v. Most,* 578 N.W.2d 250, 254 (Iowa Ct. App. 1998).

Schwartz's systematic conduct—showing up uninvited at A.S.'s home, sending inappropriate text messages and emails, requesting A.S. come to her home, and constant physical touching—over the course of the first month of the 2009 school year is sufficient to establish she engaged in a pattern, practice, or scheme of conduct to engage in sexual conduct with A.S.

III.

We next address Schwartz's challenge to the jury instruction. In determining whether the jury instructions correctly stated the law, this court reviews the instructions "as a whole to determine their accuracy." *State v. Kraai,* 969 N.W.2d 487, 490 (Iowa 2022) (quoting *State v. Donahue,* 957 N.W.2d 1, 10 (Iowa 2021)). "A challenged instruction is 'judged in context with other instructions relating to the criminal charge, not in isolation.' " *Id.* (quoting *State v. Liggins,* 557 N.W.2d 263, 267 (Iowa 1996)). Even where the challenged instruction is erroneous, this court will not reverse the jury's verdict unless the error was prejudicial. *See Des Moines Civ. & Hum. Rts. Comm'n v. Knueven,*

988 N.W.2d 694, 700–01 (Iowa 2023). "There is no reversible error if the instructions have not misled the jury." *Id.* at 701.

A.

The 2009 version of the Iowa Code defined the crime of sexual exploitation by a counselor, therapist, or school employee as follows:

> 3. Sexual exploitation by a school employee occurs when any of the following are found:
>
> *a.* A pattern or practice or scheme of conduct to engage in any of the conduct described in paragraph "*b*".
>
> *b.* Any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student. Sexual conduct includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17.

Iowa Code § 709.15(3) (2019).

We have interpreted this statute broadly. We have previously recognized that a pattern, practice, or scheme need not "involve multiple students or take place over a certain period of time." *Wickes*, 910 N.W.2d at 569. We have taken a "broad approach to the meaning of 'sexual conduct.' " *Id.* at 565. We have done so because of the legislature's explicit statement "that 'sexual conduct' was 'not limited' to the list" enumerated in section 709.15(3)(*a*) and because the legislature did "not . . . explicitly define what acts constitute 'sexual conduct.' " *Id.* Under this court's "broad interpretation" of the statute, we have held "that hugs can constitute sexual conduct" within the meaning of the statute. *Id.* at 567.

The marshaling instruction (Instruction Number 14) accurately stated the elements of the offense as set forth in the statute and our caselaw. It provided:

The State must prove the following elements of the crime of **a Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee:**

1. On or about August 21, 2009 through October 5, 2009, the defendant, Kari Jean Schwartz, engaged in sexual conduct with [A.S.].

2. The defendant, Kari Jean Schwartz, engaged in this conduct as part of a pattern or practice or scheme of conduct.

3. The defendant did so with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schwartz or [A.S.].

4. The defendant, Kari Jean Schwartz, was then a school employee.

5. [A.S.] was then a student.

If the State has proved all of the elements, the defendant, Kari Jean Schwartz, is guilty of a Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee.

Schwartz did not object to the marshaling instruction, but she did object to Instruction Number 16. It provided: " 'Sexual conduct' includes, but is not limited to kissing, hugging, touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals, or a 'sex act.' " Schwartz contends that Instruction Number 16 misstates the law because it includes hugging as a form of sexual conduct.

We disagree that Instruction Number 16 misstates the law. Instruction Number 16 tracks the relevant Code provision. The 2009 Code provided that "[s]exual conduct *includes but is not limited* to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17." Iowa Code § 709.15(3)(*b*) (emphasis added). We have already recognized that hugging can be a form of

sexual conduct within the meaning of the statute. *Wickes*, 910 N.W.2d at 567. Accordingly, the inclusion of hugging in Instruction Number 16 was a correct statement of the law rather than a defect in the instruction. Further, the district court was required to instruct the jury on hugging because hugging was one of the alleged acts of sexual conduct to be proved. *See Eisenhauer ex rel. Conservatorship of T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d at 1, 10 (Iowa 2019) ("Iowa law requires a court give a requested instruction as long as the instruction is a correct statement of law, is applicable to the case, and is not otherwise embodied elsewhere in the instructions.").

While the defendant concedes that hugging can constitute sexual conduct, she contends that Instruction Number 16 is nonetheless an incorrect statement of the law because whether hugging constitutes sexual conduct depends on context. In the defendant's view, Instruction Number 16 wrongly equates hugging, which can constitute sexual conduct depending on context, with other acts, which can constitute sexual conduct with little or no context necessary. The defendant's distinction does not hold. For example, the statute and Instruction Number 16 provide that sexual conduct includes touching of the "clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals." But one can imagine a variety of circumstances (responding to a medical issue at school, treatment of an athlete, patting a player on the backside upon entering or exiting a game) where the other identified acts are not sexual in nature. In other words, almost all the listed acts are sexual in nature only when considered in context. Hugging is no different than the rest of the acts set forth in the jury instruction, which all require some context to determine whether they constitute sexual conduct. *See* Iowa Code § 709.15(3) (flush language) ("Sexual exploitation by a school employee does not include touching that is

necessary in the performance of the school employee's duties while acting within the scope of employment.").

The defendant's distinction between hugging and other conduct does not hold for an additional reason: the instructions, when viewed as a whole, provided the necessary context. The marshaling instruction, Instruction Number 14, provided that the State was required to prove that Schwartz engaged in the sexual conduct at issue "with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schartz or [A.S.]." *See State v. Ross*, 986 N.W.2d 581, 585 (Iowa 2023) (stating that jury instructions are considered as a whole and not in isolation and that an incorrect instruction can be cured if the instructions as a whole properly advised the jury).

## B.

Even if Instruction Number 16 was technically incorrect in stating that sexual conduct "includes" hugging rather than stating that sexual conduct "may include" hugging, this technical error does not entitle Schwartz to any relief. "When [an instructional] error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." *Ross*, 986 N.W.2d at 589 (alteration in original) (quoting *State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017)). In determining whether there has been a miscarriage of justice, this court "looks . . . to the basis on which 'the jury *actually rested* its verdict.' " *Id.* (omission in original) (quoting *State v. Kennedy*, 846 N.W.2d 517, 527 (Iowa 2014)). In assessing the basis for the jury's verdict, we must remember that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde v. California*, 494 U.S. 370, 380–81 (1990). Unburdened by legal training, jurors "bring to bear upon the consideration of the case the sound common sense

which is supposed to characterize their ordinary daily transactions." *Dunlop v. United States*, 165 U.S. 486, 499 (1897).

Schwartz was not injuriously affected or in any way prejudiced by the purported instructional error in this case because there was no risk the jury could have concluded that Schwartz could be guilty of sexual exploitation of a minor for merely hugging Schwartz in a nonsexual manner. The jury was instructed that it "must consider all of the instructions together" and "[n]o one instruction includes all of the applicable law." Instruction Number 16 sets forth a nonexclusive list of what constitutes sexual conduct. Instruction Number 14, the marshaling instruction, provided that the "State must prove the following elements of the crime of a **Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee** . . . ." The instruction then went on to list the elements of "sexual exploitation." The instruction made clear that whatever the alleged sexual conduct was, the State was required to prove Schwartz "engaged in this conduct . . . with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schwartz or [A.S.]."

It is important to note that the defendant violates the statute based on one act of sexual conduct that is part of a pattern, practice, or scheme of conduct and that the acts constituting the pattern, practice, or scheme need not be sexual in nature. The Code provides a defendant commits the offense when the defendant engages in an act of "sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student," Iowa Code § 709.15(3)(*b*), and the act of sexual conduct was part of a "pattern or practice or scheme *of conduct*," *id.* § 709.15(3)(*a*) (emphasis added). Note that the Code defines the crime as a pattern, practice, or scheme "of conduct" and not a pattern, practice, or scheme "of sexual conduct." This variation indicates that the conduct constituting a pattern, practice, or scheme

need not be sexual. *See Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024) (describing the canon of "meaningful variation," according to which, "[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings"); *Bribriesco–Ledger v. Klipsch*, 957 N.W.2d 646, 650 (Iowa 2021) ("A material variation in terms suggests a variation in meaning."). While the acts constituting a pattern, practice, or scheme must be calculated toward engaging in sexual conduct—i.e., must amount to a "systematic plan" to engage in sexual conduct, *Wickes*, 910 N.W.2d at 569—only the sexual conduct must be done "for the purpose of arousing or satisfying the sexual desires of the school employee or the student." Iowa Code § 709.15(3)(*a*)(2).

If the marshaling instruction and law were not clear enough, the attorneys in this case dispelled any risk the challenged instruction misled the jury. In closing argument, the prosecutor told the jury that "Instruction Number 14 is the working instruction in this particular case. It's the meat and bones." "Instruction Number 14 . . . these are the elements. This is what the State needed to prove." The prosecutor then explained that under the instructions the jury was given, it "*can* find hugging as a sexual conduct." (Emphasis added.) The prosecutor did not argue that hugging is sexual conduct per se. Instead, he argued that "[t]he nature of the hugging in this particular case was a sexually motivated hug, and she says it to you, I get the better part of the deal."

Defense counsel explained the same thing to the jury. "The issue in the case is whether Ms. Schwartz engaged in sexual conduct or some scheme with the specific intent to arouse the sexual desires of herself or [A.S.]. That's in Number 14 of the jury instructions." Defense counsel focused on the nature of the hugs and argued the "hugs were not sexual in nature" and "were in fun." Then defense counsel specifically told the jury that it was to read instructions

number 16 and number 14 together with respect to the hugs to determine whether the hugs constituted sexual conduct:

> So when we talk about the sexual conduct, Instruction Number 16, I want you to think about that in context with Number 14, because that sexual conduct is a definition. And in Number 14, it talks about that there must be specific intent to satisfy the sexual desires of Ms. Schwartz or [A.S.]. So those two things have to be read in concert with each other. So the question for you is are all hugs sexual conduct? Because that instruction says, including, but not limited to, and then a list of items, and hugs is on there, but we would argue no. I mean, look at the context and the intent. And so you're going to have to look at the specific intent on the next line in Number 14. Does the hug arouse the sexual desires of either of the individuals? Does that make sense? No.

In rebuttal, the prosecutor never argued that hugging was sexual conduct per se. Instead, he argued that the hugging in this case was sexual:

> When you meet the student and you like her body and you like to hug her and you want to feel her close to you and your hugs last forever and they're full-frontal hugs, which you want to deny, but you have a picture that shows them, but now you want to deny that you do it. The instruction tells you that's a sexual conduct. Especially when you say, I get the better part of the deal and I look forward to them. What else? Why else would you call them a better end of the deal? Why would you look forward to hugging this student? Why else would you talk about her pipes being so strong? Same student that you tell, I like you. You're pretty.

The defendant offers no explanation of how these jury instructions, as framed and argued by the lawyers, could have misled the jury and resulted in prejudice, and we can find none. When the instructions are read together as a whole in light of how this case was tried and argued to this jury, the record affirmatively establishes that the instructions could not have misled the jury and that there is no risk the jury could have found Schwartz guilty based only on nonsexual hugging. Schwartz's challenge to the jury instruction thus fails.

IV.

For the foregoing reasons, we affirm both the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Oxley, McDermott, and May, JJ., join this opinion. Christensen, C.J., files a dissenting opinion, in which Waterman and Mansfield, JJ., join.

CHRISTENSEN, **Chief Justice (dissenting).**

Jury instructions need not be perfect, but they do need to give the jury a clear understanding of the applicable law. Unfortunately, the jury instructions in this case did not provide that understanding, and I am not convinced that the record before us affirmatively establishes that this instructional error did not prejudice the defendant. Thus, while I agree with the majority that sufficient evidence exists to sustain Schwartz's conviction, I would vacate the court of appeals decision, reverse her conviction, and remand for a new trial.

**I. Jury Instruction's Definition of "Sexual Conduct."**

The majority contends the district court properly instructed the jury on the meaning of "sexual conduct." Specifically, the majority focuses on the fact that the Code section provides examples of what constitutes "sexual conduct" without limiting the definition of "sexual conduct" to the examples listed. *See* Iowa Code § 709.15(3)(*b*) (2009) ("[s]exual conduct *includes but is not limited* to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17" (emphasis added)) The majority further contends that even if Instruction Number 16 was incorrect for stating sexual conduct includes hugging, Schwartz was neither injuriously affected nor prejudiced by the instructional error because "there was no risk the jury could have concluded that Schwartz could be guilty of sexual exploitation of a minor for merely hugging Schwartz in a nonsexual manner." I disagree.

The district court provided the following relevant marshaling instructions:

INSTRUCTION NO.14

CRIME CHARGED – ELEMENTS OF THE OFF[EN]SE

The State must prove the following elements of the crime of a Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee:

1. On or about August 21, 2009 through October 5, 2009, the defendant, Kari Jean Schwartz, engaged in sexual conduct with [A.S.].

2. The defendant, Kari Jean Schwartz, engaged in this conduct as part of a pattern or practice or scheme of conduct.

3. The defendant did so with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schwartz or [A.S.].

4. The defendant, Kari Jean Schwartz, was then a school employee.

5. [A.S.] was then a student.

If the State has proved all of the elements, the defendant, Kari Jean Schwartz, is guilty of a Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee. If the State has failed to prove any one of the elements, the defendant, Kari Jean Schwartz, is not guilty of a Pattern, Practice, or Scheme of Sexual Exploitation by a School Employee, and you will consider the lesser included crime of Sexual Exploitation by a School Employee explained in Instruction No.15.

INSTRUCTION NO.16

"Sexual conduct" includes, but is not limited to kissing, hugging, touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals, or a "sex act[.]"

Schwartz was convicted of violating Iowa Code section 709.15(3)(*a*)(1), which states in relevant part that "[s]exual conduct includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17." Instead of using this definition, the district court altered the language over Schwartz's objection to add "hugging" to the above list based on our decision in *State v. Wickes*, 910 N.W.2d 554 (Iowa 2018). There, we held "that hugs *can* constitute sexual conduct under Iowa Code section 709.15(3)(*a*)(2)." *Id.* at 567 (emphasis added). However, we emphasized the importance of context in

determining whether a hug constituted sexual conduct, stating, "[W]e must examine the actions of the teacher 'in light of all of the circumstances to determine if the conduct at issue was sexual and done for the purposes of arousing or satisfying the sexual desires of the [teacher] or the [student]' in violation of 709.15(3)(*a*)(1)." *Id.* at 565–66 (quoting *State v. Romer,* 832 N.W.2d 169, 180 (Iowa 2013)) (second and third alterations in original).

We reiterated this throughout our decision, subsequently declaring, "Of critical importance in our analysis is the context and circumstances that surrounded the physical contact—the hugs—that are at issue here." *Id.* at 566. After discussing the context of the hugs at issue, we stressed,

> This context informs our analysis of what resulted in daily or more often hugs between Wickes and A.S. It is important to note that nothing should prohibit teachers from hugging students for reassurance, comfort, or in congratulation without putting themselves at risk of being charged with the crime of sexual exploitation. But on this record, it is clear from the voluminous messages and their content discussing the hugs and his attraction to A.S., Wickes's intention with these hugs went beyond mere reassurance and support for A.S. . . .
>
> . . . Consequently, in the context of the multiple messages with A.S. as a whole, and in combination with the hugging, there is sufficient evidence that the hugs constituted sexual conduct with A.S. as opposed to an ordinary hug between a teacher and student intended to comfort and reassure the student.

*Id.* The problem with including "hugging" in Instruction Number 16's definition of "sexual conduct" is that it fails to convey the importance of this context. Instead, it equates hugs with other actions that are specifically identified in Iowa Code section 709.15(3)(*a*)(2)'s definition of "sexual conduct" and that would normally be regarded as either sex acts or sexually motivated—like kissing or touching a student's genitals—with little to no context necessary.

Notably, a teacher would have no legitimate reason to kiss, sexually touch, or engage in a sex act with a student. But a hug is different. Teachers can have

valid reasons to give comforting hugs to students. In addition, a teacher may hug a student in a way that is socially inappropriate yet not sexual. Schwartz contends that her hugs with A.S. fell into either of these two categories. And apparently A.S. felt the same way when she reported Schwartz to the police in 2020 and said that the hugs did not feel sexual in nature.

However, by telling the jury that "hugging" was per se a sexual act, the district court tipped the scales against Schwartz. Schwartz did not dispute she had hugged A.S.; she just maintained that the hugs were not sexual. The State took advantage of this overly broad instruction in closing argument:

> [W]e might all have other ideas of what a sexual conduct is when we came in here, but the law in Iowa here is telling us that there's something called sexual conduct, but it says, it includes, but is not limited to, kissing, hugging, touching of the clothed or unclothed inner thigh, breast, groin, buttocks, anus, pubes, or the genitals; or a sex act. This is an expansive list, folks.

As the State later asserted, "[I]f you don't find the State's case is whatever, you can find hugging." And again in rebuttal: "The instruction tells you that's a sexual conduct."

It is true that the marshaling instructions required that the defendant acted "with the specific intent to arouse or satisfy the sexual desires of [Schwartz or A.S.]." And the State claimed that Schwartz's "better end of the deal" aside in the September 29 email showed that she had sex on her mind. Still, the law treats the act and the intent as two separate elements. By telling the jury that all of Schwartz's hugs amounted to "sexual" conduct, the court predisposed the jury to find that they were done for the purpose of arousing Schwartz's "sexual" desires, even though the evidence of that was far from overwhelming. Once you tell the jury that conduct is sexual, aren't you telling them that it is being done for a sexual purpose?

Yet, the majority maintains the rest of the marshaling instructions properly informed the jury that Schwartz could not be convicted under the misunderstanding that any and all hugging between a teacher and a student would qualify as sexual exploitation by a school employee. *See, e.g., State v. Kraai*, 969 N.W.2d 487, 490 (Iowa 2022) ("An incorrect or improper instruction can be cured 'if the other instructions properly advise the jury as to the legal principles involved.'" (quoting *Thavenet v. Davis*, 589 N.W.2d 233, 237 (Iowa 1999) (en banc))). Even considering the instructions as a whole, they only required the jury to find that *some* act was done for sexual gratification. That act could have been the touching in the stairwell. Nothing in the instructions sufficiently explained that the *hugs* needed to be done "with the specific intent to arouse or satisfy the sexual desires of Kari Jean Schwartz or [A.S.]." Plus, Instruction Number 14's equation of hugging to more overtly sexual acts in the definition of "sexual conduct" allowed the jury to easily leap to the conclusion that Schwartz was hugging A.S. "to arouse or satisfy [her] sexual desires" or those of A.S. without considering the context of these hugs. This lack of specificity only adds to our concern that the instructions did not give the jury a clear understanding of the applicable law or issues. Because the jury instructions misstated the law, we must "presume prejudice and reverse unless the record affirmatively establishes there was no prejudice." *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010).

And, the record in this case does not affirmatively establish that Schwartz was not prejudiced by the instructional error. While I agree with the majority's conclusion that there is sufficient evidence to uphold Schwartz's conviction, "that conclusion does not control our determination of whether prejudice flowed from the flawed marshalling instruction[s]." *State v. Harris*, 891 N.W.2d 182, 189 (Iowa 2017). This was a close case. In 2009, the school district conducted an investigation. A.S. turned over Schwartz's emails and texts, and A.S. was also

interviewed. No case was brought at that time. But a decade later, A.S. added a claim that Schwartz had touched her sexually on a stairwell. As a result, Schwartz was charged criminally in 2020 and convicted in 2021.

I agree that Schwartz at a minimum used poor judgment and had inappropriate communications with A.S. But the case came down to hugs and the touching incident on the stairwell. Schwartz admitted hugging A.S., but she insisted that she was merely attempting to comfort A.S. through these hugs or posing for pictures at the prompting of others. When A.S. was interviewed by police in 2020, she said that the hugs did *not* feel sexual in nature. Thus, there was evidence the hugs were nonsexual. Nevertheless, the State emphasized to the jury that hugging was sexual conduct in its closing arguments. For example, the State urged,

> Why does [Schwartz] try not to say that she hugged this student? Because she knows that sexual conduct in those instructions you've been given includes hugging, that you can find hugging as a sexual conduct.

The only other evidence of possible sexual conduct between Schwartz and A.S. is the stairwell touching, but there was also evidence that the touching on the stairwell did not actually occur. A.S. testified at trial that Schwartz touched her in the genital area on the school stairwell on the morning of September 29, 2009. But A.S.—who was then nearly an adult—did not report that incident in 2009 when she was interviewed. In fact, she denied at the time that there had been any physical contact. Not until years later, when A.S. was in her late twenties, did A.S. report the stairwell incident. Even so, when she was interviewed by police, A.S. claimed the stairwell incident had happened *before* the final September 28–29, 2009 overnight exchange of emails with Schwartz. At trial, she said it happened *afterward*.

In her testimony, Schwartz did not dispute talking to A.S. on a stairwell, but she denied touching her sexually. Schwartz pointed out that the stairwell was "a very public place" with "lots of traffic." Schwartz said that A.S. had been crying on the 28th and that A.S. approached her asking to talk. They went to the stairwell so they would not be overheard. And they talked. According to Schwartz, this was the day *before* the overnight exchange of emails.

Schwartz testified that the interaction between herself and A.S. suddenly stopped on the 29th when A.S. turned over Schwartz's email to the other teacher. A.S. testified, by contrast, that after she handed over the email to the other teacher on the morning of the 29th and was noncommunicative in class, Schwartz grabbed her by the arm at the end of class, took her to the top of the stairs, and sexually touched her.

The majority quotes Schwartz's email from early morning on the 29th in full:

> Sweetest [A.],
>
> There is no place i would rather be then here for you. You inspire me as well. My life story…it is a long one. some days I feel like it is a soap opera but it has helped make me who I am today and somehow I got to meet you and it's the people like that in my life, that make everything worth while. It's interesting to me how much we have in common, my high school days looked a lot like yours. Volley ball, tennis, band, rollerblading, working out on the farm, stud[y]ing, not letting others see past the smile. How does that happen? I had a lot of really great friends in high school too but it was always my teachers I could talk to because no one else really understood me or why priorities are what they are. I am not sure [I] should have told you and the other girls what I did about me especially since no one in [I]ndependence, or even in [I]owa really knows a lot about me or my past. But I don't have anything to hide either. if you guys want to know i will share. Chances are you guys will forget the stories but you, (well not really you—cause you already know) but they maybe a little bit more gr[ate]ful for what they have. The book will be long forgotten about before the time gets here I am sure. You, [A.S.], have a heart of gold. I hold your trust very high and I will never intentionally hurt you. I have picked up on you have a lot going on in your heart and [I] am here for you. Plus, sometimes

i think i get the better end of the deal cause I get one of your hugs. :) So if I get to[o] attached make sure you say something. You can do anything! I do hope to learn more about you as the days go by. You are wonderful. Hope you are sleeping tight. off to rollerblade, hope I don't get blown away!!! Love ya!

Kari

But the majority fails to quote A.S.'s nighttime email to which Schwartz was responding:

> Dear Ms. Kari,
>
> It means more than anything to me knowing the fact that you are there. I can't even explain how much…You have inspired me so much. Knowing so little of your life story and your sense of respect and who you have become has impacted me the most. Knowing how you have made yourself for the better. People with stories like you gain great respect from me.
>
> Thank you for listening to me today. Somebody to simply talk to, is worth more than gold to me. And I'm glad it was you. I have a hard time finding people that I can trust enough to actually talk with, and have them actually listen. I tend to keep my feelings and thoughts hidden extremely deep, even from my family it seems. As you noticed most days I can cover it up with a smile :)
>
> You will probably figure out my life story as days go by… :) And yes…hugs are the best, and my great pipes just made them better ;)
>
> Btw…We MUST have a rollerblading date. This is the perfe[c]t weather for it! :)
>
> Thank you,
>
> [A.]

Obviously, it is the role of juries to sort through these conflicts in the evidence, but clearly there were conflicts. Given these conflicts, it was important for the jury instructions to accurately state the law. Here, they did not. I do not question that there was sufficient evidence to support a guilty verdict. However, on this record, the jury could have found reasonable doubt as to whether the sexual touching on the stairwell occurred, while finding that the hugging took

place. Having been told that the hugging was per se sexual conduct under Iowa law, i.e., that it was no different from kissing and touching the genital area, the jury could have concluded that Schwartz committed sexual exploitation without determining beyond a reasonable doubt that Schwartz's hugging was actually sexual in nature. The close nature of this case and the flawed jury instructions undermine my confidence in the jury's verdict.

**II. Conclusion.**

I respectfully dissent from the majority because this record does not affirmatively establish that there was no prejudice from the jury instructions. I would vacate the decision of the court of appeals, reverse Schwartz's conviction, and remand for a new trial with proper instructions.

Mansfield and Waterman, JJ., join this dissent.